**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
\------------------------------------------------------------ X
JAIME PICCOLO,                                       :
                                                     :     Civil Action No.:
                              Plaintiff,             :
                                                     :
              v.                                     :     **COMPLAINT**
                                                     :
EQUINOX HOLDINGS, INC. and GARY                      :
BROWNE, in his individual and professional           :     **Jury Trial Demanded**
capacities,                                          :
                                                     :
                              Defendants.            :
\------------------------------------------------------------ X

Plaintiff Jaime Piccolo ("Plaintiff" or "Ms. Piccolo") brings this complaint against

Equinox Holdings, Inc. ("Equinox" or the "Company") and Gary Browne ("Mr. Browne")

(together, "Defendants"), and hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.       It would not be an understatement to say that the culture of the luxury fitness

company Equinox is uniquely and ubiquitously misogynistic and anti-women.  Indeed, over and

over again, Equinox's female employees – particularly mothers – are subjected to egregious

discrimination and sexual harassment, including sexual assault.  Like clockwork, Equinox turns a

blind eye to this unlawful conduct and retaliates against those who are brave enough to report it.

2.       Ms. Piccolo, one of the Company's longest tenured and most successful

employees, experienced this environment firsthand.  From the very start of her employment, Ms.

Piccolo – the Company's former Senior Director of Corporate Accounts – was subjected to

blatant acts of sexual harassment at the hands of multiple people, from her hiring manager all the

way up to Gary Browne, Equinox's Senior Vice President of Revenue,[1] along with at least a half a dozen other male managers and executives.

3.      The sexual harassment included, among many other things: (i) unwanted sexual touching and messages, including texts stating, "let's fuck like crazy" and "slide your pussy on top of my face"; (ii) leering at and commenting on Ms. Piccolo's "big boobs"; (iii) asking whether Ms. Piccolo had ever engaged in a "threesome" and, if so, with whom; (iv) asking Ms. Piccolo with whom she was sleeping; (v) asking Ms. Piccolo the number of men with whom she had sex; (vi) commenting on their perception that Ms. Piccolo's ex-husband had a lot of money and, therefore, that the Company should not have to pay her; (vii) asking Ms. Piccolo to try on lingerie in their presence; (viii) diminishing Ms. Piccolo's business acumen and telling her that she should focus on closing out sales with male clients because she should be able to do so based on her sexuality alone; and (ix) pressuring Ms. Piccolo to go to a strip club.

4.      Things were made only worse for Ms. Piccolo because she is a mother of two young children.  Indeed, Mr. Browne habitually and emphatically expressed deep contempt for Ms. Piccolo's role as a mother to her two young children.  This came to a head at the end of 2020 and in early 2021, when Mr. Browne denied Ms. Piccolo's reasonable requests to work from home part time to care for her children and address their needs.

5.      For example, Mr. Browne repeatedly communicated that Ms. Piccolo was not allowed to request scheduling or remote work accommodations when schools were closed and childcare options were non-existent due to the pandemic.

---

[1]      At the time Ms. Piccolo was terminated, Mr. Browne's title was Senior Vice President of Sales.  Subsequent to her termination, he was promoted to Senior Vice President of Revenue.

6.      Mr. Browne even attempted to discipline Ms. Piccolo for purportedly failing to appear "in person" at clubs despite there being no legitimate reason for her to be physically in clubs as often as Mr. Browne demanded, and it had never been a requirement for Ms. Piccolo to have an inflexible, in-person schedule.

7.      Notwithstanding her need to care for her children, Ms. Piccolo performed excellently throughout the pandemic.  Nevertheless, Mr. Browne singled out Ms. Piccolo and slashed her compensation to 50% without a legitimate basis.  When Ms. Piccolo protested that she had children to care for, Mr. Browne revealed his discriminatory animus: "Don't you ever bring your children into this. I don't ever want to hear about your children."

8.      As a result of Mr. Browne's refusal to appropriately accommodate Ms. Piccolo's childcare needs, both she and her daughters suffered significant emotional distress and severe associated harms.  Ms. Piccolo confided in Scott Freimauer, Senior Director, Global Corporate Sales, about the tremendous damage that Mr. Browne's discriminatory conduct was causing her children.  Still, no remedial action was taken.

9.      Equinox cannot claim that it was unaware of the unlawful conduct described herein, as the evidence will demonstrate unequivocally that the problems at Equinox stem from a misogynistic "bro-culture" that repeatedly turned a blind eye to the mistreatment of women.

10.      Take, for example, Jed Prisby, who sent the lewd text messages to Ms. Piccolo referenced above.  Long before these sexually harassing text messages were sent, Mr. Prisby, who was a Senior Director of Club Operations, was the subject of a sexual harassment complaint made by another Equinox employee.  No remedial action was taken, and Mr. Prisby went on to sexually harass Ms. Piccolo.

11.     Another manager who sexually harassed Ms. Piccolo is former Regional Director Brian DeCato.  Mr. DeCato was the subject of numerous sexual harassment complaints and at least two sexual harassment lawsuits.  In a 2015 lawsuit, Mr. DeCato was alleged to have fired an employee for complaining about sexual harassment while insinuating that the victim was to blame for the sexual advances at issue.  Nevertheless, according to a second lawsuit filed in 2019, Equinox continued to employ Mr. DeCato while he sexually harassed and/or assaulted half a dozen other women at Equinox, including sexually harassing Ms. Piccolo.  Equinox terminated or forced out many of Mr. DeCato's victims.  However, Mr. DeCato – who engaged openly in this behavior at Company events and even admitted some of the sexual harassment during a purported "investigation" – was not meaningfully reprimanded.  When Mr. DeCato finally "resigned" many months later, he was lauded in an email and given a significant severance.

12.     Equinox's apathetic response to Mr. DeCato's conduct is eerily similar to the way that the Company treated Ms. Piccolo's own complaints of discrimination.  Indeed, on December 15, 2021, Ms. Piccolo, through counsel, put Equinox – which already knew much of what is alleged herein – on notice of additional harassing conduct by its employees.  Upon information and belief, neither Equinox nor its outside counsel interviewed a single harasser identified herein until at least January 10, 2022, almost an entire month later.  During that time, the harassers who still work for the Company, including Mr. Browne and Gianfranco Pozzolini, the Executive Vice President of Operations and Member Experience, continued to perform their jobs without modification.  The same is true to this day.

13.     Examples of discrimination against and harassment of women at Equinox are myriad.  On January 1, 2020, Alison Sadel (former Equinox National Account Executive) and Megan DiDomenico (former Equinox Senior Regional Sales Manager) filed suit against the

Company alleging pay, gender, pregnancy, and familial status (caregiver) discrimination. Among other things, Ms. Sadel alleged that Mr. Browne and Regional Manager John Greco repeatedly stated, "What is it with all the account executives getting pregnant," implying that it was a problem for the Company and that pregnant women could not perform their duties.

14.     Relatedly, on November 16, 2021, Ms. Piccolo received a text message from a man who is the former Director of Leadership at Equinox.  In the text message, he revealed that he had a meeting scheduled with the Company's outside attorneys in connection with the lawsuit brought by Ms. Sadel and Ms. DiDomenico.  He wrote, "lol I dunno why they want me!! I don't lie!" – an obvious acknowledgment that Ms. Sadel's and Ms. DiDomenico's legal claims are meritorious.

15.     The former Head of Equinox's spa business, Nicole Vitale, alleged in a federal lawsuit that "she heard sales teams routinely went to strip clubs and charged the costs to Equinox, that Equinox's chairman once asked a manager to collect the phone numbers of certain attractive females [and] that an employee was once given a birthday cake in the shape of a female buttocks."

16.     A female former Equinox Corporate Sales Manager suffered a discriminatory failure to promote and was constructively discharged as a result of the harassment she endured at the hands of Mr. Browne.  As a result of the Equinox-induced trauma she suffered, the former manager was out of work for almost two years.

17.     An older female former Account Executive in the Washington, D.C. area was constructively discharged after Mr. Browne's conduct caused her to develop detrimental health conditions.

18.     A lesbian mother of two from Equinox's Northeast Region, who was one of the highest performing Account Executives at the Company, was also discriminatorily denied a promotion and constructively discharged.

19.     One of the very few women promoted within Mr. Browne's organizational structure was a former Regional Sales Director for the Northeast Region.  She was discriminatorily demoted after two years of consistently positive performance without any prior warnings or write-ups.

20.     Similarly, in 2021, Equinox brought in a female consultant who was ostensibly hired to advocate for women and gender equality in the workplace.  She was promptly terminated after she observed a "bro-culture" at Equinox.

21.     Earlier this year, Account Executive Brieanna Skarbo, Equinox's longest tenured Account Executive, filed a charge with the Equal Employment Opportunity Commission ("EEOC") detailing the Company's expectation that client-facing female employees appear young and sexy[2], and its equally discriminatory decision to reward male and young female employees with higher compensation and more lucrative account portfolios than older female employees.

22.     After the instant case was filed with the EEOC, Equinox paid lip service to its purported commitment to diversity and inclusion, claiming publicly in a statement, "We take all claims of misconduct very seriously and strive to foster a culture built on respect, diversity and inclusion, and it is required that everyone in our community to [sic] uphold these values . . .

---

[2]     These expectations were made clear to Ms. Skarbo during her first week working for Equinox, when her predecessor told her to "wear short dresses and have your tits out and things will go more smoothly for you here."

Employees found in violation of our policies are subject to disciplinary action, including termination."

23.     Yet in April 2022, less than two months later, when an employee asked Equinox President Scott DeRue at an employee Town Hall to respond to Ms. Piccolo's EEOC charge, the first thing he did was to implicitly threaten individuals who come forward with claims of discrimination, saying that the company would "vigorously defend against false allegations."  To drive the point home, he reiterated, "We will defend ourselves and the company from false allegations," before moving on to the same pablum about "a climate, a culture and an environment where everyone can thrive."  The statements described above are consistent with Equinox's history of making false statements pertaining to diversity and inclusion.  Indeed, in August 2019, it was reported that Steven Ross, who is the majority owner of Related Companies, which owns Equinox, held a fundraiser for then-President Donald J. Trump, and charged participants $100,000 to have their picture taken with the President.  In response to the ensuing controversy, Harvey Spevak, the Executive Chairman and Managing Partner of Equinox, issued a statement in which he claimed that Equinox has a "culture based on equality, diversity, inclusivity, integrity, empathy, and mutual respect. A community where everyone is welcome."

24.     Obviously, as described herein, that simply is not true.

25.     In fact, even after making these public statements, Equinox's misogynist and youth obsessed culture runs rampant.  Indeed, as recently as September 26, 2022, Equinox Sales Manager Anthony "Tony" Varga sent an email to his three supervisors (Orange County General Manager Paul Torrao and two assistant managers, both of whom are women), Ms. Skarbo and several Membership Advisors (one of whom is a woman and another who is a Black man).  The

email subject line was "The Final Push - Monday Motivation," and in addition to outlining the

end-of-the-month sales goals, it contained the following racist and misogynist meme: [3]



26.     The same day that Mr. Varga emailed the meme, Ms. Skarbo was working with

Mr. Torrao in his office when Mr. Varga appeared and asked Mr. Torrao if one of the female

assistant managers was upset with him for sending the meme.  Mr. Torrao replied that the

assistant manager was, in fact, upset.

27.     Ms. Skarbo, who had not yet seen the email, asked why the female assistant

manager was upset.

28.     Mr. Varga then opened his laptop, showed Ms. Skarbo the meme and laughingly

explained to her that, in his own words, its origin is a "famous" pornographic film found on the

---

[3]     "Hardnox" is the nickname given to the Orange County Sports Clubs sales team.  Equinox
sales teams refer to their list of potential clients as a "pipeline."

online pornography platform PornHub in which the five, visibly aroused black men pictured "gang bang" the blonde, white woman dressed as a tween[4] in the photograph.

29.     When Ms. Skarbo, horrified, asked what the meme had to do with sales or the sales team, Mr. Varga sickeningly replied that he meant, "We are going to fuck the shit out of our [client] pipelines."

30.     One would expect a manager to intervene to stop his supervisee from creating such a blatantly hostile work environment, but at no time did Mr. Torrao stop Mr. Varga from showing Ms. Skarbo the meme, discussing pornographic movies, or perpetuating harmful[5] and dangerous[6] stereotypes that sexualize young girls and hypersexualize black men.

31.     To the contrary, Mr. Torrao laughed along with Mr. Varga throughout the conversation with Ms. Skarbo, and, the following day, he took Mr. Varga and two other male Membership Advisor to an Angels baseball game to celebrate a "job well done" for the month of September.

32.     Furthermore, upon information and belief, Mr. Varga has not been disciplined for this incident, despite the complaint of the female assistant manager.

---

[4]     That the woman is intended to look like a tween is evidenced by her pink Unicorn-themed pajamas, pigtails, braces, and cross-legged sitting position.

[5]     The oversexualization of girls is associated with a multitude of harms, including eating disorders, low self-esteem, and depression. https://www.apa.org/news/press/releases/2007/02/sexualization

[6]     It is well documented that during the height of lynching in the United States, "[w]hites' fear of sexual contact between Black men and white women was pervasive and led to many lynchings. Narratives of these lynchings reported in the sympathetic white press justified the violence and perpetrated the deadly stereotype of African American men as hypersexual threats to white womanhood."  https://lynchinginamerica.eji.org/report/  The legacy of these vile and dangerous stereotypes reverberates to the present day.  See, e.g., https://www.washingtonpost.com/outlook/2020/05/28/amy-cooper-played-damsel-distress-troubling-history-this-trope/.

33.     The message could not be more clear – a hostile work environment is not only tolerated at Equinox but condoned.

34.     Mr. Varga's conduct should have come as no surprise to Mr. Torrao, as a little more than two months earlier he used his Equinox email account on two consecutive days to send memes to Mr. Torrao, two assistant managers and several other Equinox employees which made light of his lack of compliance with the Mutual Respect training mandated for Equinox employees, which includes a module on sexual harassment.

35.     On July 5, 2022, Mr. Varga sent the following meme:







36.     As if Mr. Varga had not already made plain his disdain for the Mutual Respect

training, the following day he emailed the meme pictured below to the same group plus three

additional Equinox employees:



37.     The July 6, 2022, meme includes a screenshot of a slide from the training

containing a hypothetical situation in which an employee sends memes which "involve sensitive

or controversial subjects" to a group of colleagues using social media.  The slide goes on to

instruct Equinox employees that such memes may be considered harassment and contribute to a

hostile work environment if any of the recipients are offended.  Immediately below the Mutual

Respect training screenshot, Mr. Varga added a photo of the blind singer Ray Charles with the

tagline, "I'm gonna pretend I didn't see that."

11

38.     The clarity of Mr. Varga's intent to ignore prohibitions against workplace harassment is matched only by Equinox's intention to pay nothing more than lip service to providing a harassment-free workplace.  Indeed, upon information and belief, neither Mr. Torrao nor any other supervisor admonished Mr. Varga for any of these memes or reinstructed him on the need to comply with Equinox's purported policies against harassment.

39.     In short, it is absolutely abhorrent that Equinox either: (i) has deluded itself into believing that countless women are simply lying about their experiences; or (ii) simply does not care whether its female employees are sexually harassed and assaulted.

40.     Whatever the case, that the mistreatment of women is baked into the culture at Equinox should come as no surprise because the leadership at Equinox is almost exclusively dominated by men.  Starting with Harvey Spevak, the Executive Chairman and Managing Partner of Equinox, virtually all of the Company's critical executive functions are run by men, including, *inter alia*: (i) President, Scott DeRue; (ii) former President and current Senior Advisor, Scott Rosen; (iii) Co-President and Chief Design Officer, Jeff Weinhaus; (iv) Executive Vice President of Operations and Member Experience, Gianfranco Pozzolini; (v) Executive Vice President and Chief People Officer, David Ard; (vi) Executive Vice President and Chief Marketing Officer, Peter Giorgi; (vii) Executive Vice President and Chief Technology Officer, Eswar Veluri; (viii) Executive Vice President and Chief Financial Officer, David Phillips; and (ix) Senior Vice President of Revenue, Gary Browne.  In fact, with the exception of the Company's Chief Legal Officer, Yen Chu, every Executive Vice President and President at Equinox is a man.

## NATURE OF CLAIMS

41.     The unlawful discrimination and retaliation described herein was committed in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) *et. seq.*, as amended by the Civil Rights Act of 1991 ("Title VII"); the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621, *et. seq.*, as amended by the Older Workers Benefit Protection Act and the Civil Rights Act of 1991 ("ADEA"); the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et. seq.* ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL").

## ADMINISTRATIVE PROCEDURES

42.     Ms. Piccolo filed a charge of discrimination and retaliation, arising out of the facts described herein, with the EEOC, alleging violations of Title VII and the ADEA.  On July 27, 2022, the EEOC issued Ms. Piccolo a Notice of Right to Sue.  She has asserted her Title VII and ADEA claims within 90 days of its receipt.

43.     Pursuant to NYCHRL § 8-502, Ms. Piccolo will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, within ten days of its filing, thereby satisfying the notice requirements of that section.

44.     Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

45.     Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has subject matter jurisdiction over this action because this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII and the ADEA.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under State law pursuant to 28 U.S.C. § 1367(a).

46.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

47.     Plaintiff Jaime Piccolo is the former Senior Director of Corporate Accounts of Equinox.  At all relevant times, Ms. Piccolo worked at the New York City office of the Company.  Ms. Piccolo is a resident of the State of New York and, at all relevant times herein, met the definition of "employee" under all relevant statutes.

48.     Defendant Equinox Holdings, Inc. is a domestic corporation incorporated in Delaware with its principal office in New York, New York.  At all relevant times, Equinox Holdings, Inc. met the definition of an "employer" under all relevant statutes.

49.     Defendant Gary Browne is the Senior Vice President of Revenue at Equinox. At all relevant times, Mr. Browne worked at the New York City office of the Company.  Mr. Browne is a resident of the State of New York and, at all relevant times here, was Ms. Piccolo's supervisor.

## FACTUAL ALLEGATIONS

## I.     MS. PICCOLO'S EXCEPTIONAL PERFORMANCE AT EQUINOX

50.     Prior to her unlawful termination, Ms. Piccolo was one of Equinox's longest tenured and most loyal employees.

51.     Ms. Piccolo joined Equinox in April 2002 and dedicated nearly 20 years of her life to building the Company.

52.     When Ms. Piccolo joined Equinox, the Company had only a handful of clubs and was a fraction of the business that it is today.

14

53.     Ms. Piccolo played a substantial role in the Company's growth and success and worked tirelessly to develop thousands of lucrative business relationships over the years.

54.     She also cultivated brand loyalty to Equinox by serving as a corporate ambassador to Fortune 500 companies, law firms and banks, along with countless technology, real estate and financial services companies.

55.     Ms. Piccolo's tremendous success is evidenced by her once seemingly limitless career trajectory at Equinox.

56.     When she joined the Company in 2002, Ms. Piccolo held the role of Membership Advisor at the Company's East 43rd Street location.

57.     Within six months, Equinox promoted her to the position of Sales Manager at the same location, after which she was promoted to an Account Executive position at Equinox's Wall Street location.

58.     Ms. Piccolo was asked to "change the culture" at the Wall Street location and essentially rescue it from the economic malaise of the immediate post-September 11, 2001 period.  She did just that.

59.     Following her success at the Wall Street location, Equinox entrusted Ms. Piccolo to open up locations nationwide, and she eventually developed an Account Executive team to scale the Company's growth.

60.     Over the next nearly two decades, Ms. Piccolo worked her way up in the organization and, in June 2019, was ultimately promoted to the position of Senior Director of Corporate Accounts, one of the top sales positions at the Company.

61.     Among her other responsibilities while employed by Equinox, Ms. Piccolo managed the sales performance of more than 100 Equinox club locations in the New York City,

Chicago, Los Angeles, San Francisco, Texas, D.C., Boston, Toronto, Vancouver and London areas.

62.     Ms. Piccolo also oversaw Account Executives at each location, delivered trainings and built comprehensive strategies to ensure the achievement of target objectives.

63.     In connection with her responsibilities, Ms. Piccolo was entrusted by the Company's senior leadership to support struggling clubs, conduct in-depth audits to evaluate operations and deliver targeted feedback to promote the profitability of the clubs.

64.     At the same time, Ms. Piccolo oversaw the deployment of a wide range of training and promotional programs conducted at the senior-leadership level.

65.     Ms. Piccolo also spearheaded the rollout and launch of more than 50 new, high-end pre-sales fitness clubs.

66.     She further identified opportunities for new business through referrals and business-to-business partnerships and personally spearheaded the establishment of countless critical agreements and relationships.  Indeed, Ms. Piccolo developed over 1,000 partnerships, including with J.P. Morgan, Citibank, Latham & Watkins, Skadden Arps, Cravath, Swain and Moore, PWC, Deloitte, Ernst & Young, ESPN, Fox, CNN, CBS, NBC, Netflix, Viacom, Conde Nast, Google, Facebook, Twitter, CBRE, Douglas Elliman, Lululemon, Coach, LVMH and Saks Fifth Avenue, among many, many others.

67.     These relationships ultimately resulted in more than 60,000 new corporate memberships per year.

68.     In connection with these and other accomplishments, Ms. Piccolo led multiple internal cross-functional teams involving marketing, media, operations, legal and procurement.

69.     As a result of Ms. Piccolo's outstanding performance, she received multiple awards and recognitions from the Company, including, in 2012, the "Amazing Amazing" award. The Amazing Amazing award recognizes Equinox employees who "live the brand" and exemplify leadership, innovation, revenue, and results.  Ms. Piccolo was so highly regarded that she was also selected to lead and pitch Equinox's Corporate Omni Strategy Programming, which included the SoulCycle at-home bike and Equinox+, both of which were and continue to be critical revenue generators during the pandemic.

70.     Simply put, it is no exaggeration to say that Ms. Piccolo has been among the Company's most valuable employees, and, as a direct a result of her hard work and under her leadership, corporate sales (according to Mr. Browne) did not miss plan once over the span of approximately 15 years.

## II.    MS. PICCOLO IS SUBJECTED TO EGREGIOUS GENDER DISCRIMINATION AND SEXUAL HARASSMENT STARTING FROM THE VERY BEGINNING OF HER EMPLOYMENT

71.     Ms. Piccolo's success is even more impressive given the environment she was forced to navigate throughout her tenure at Equinox.  Indeed, it would not be an understatement to say that Equinox's workplace culture was ubiquitously misogynistic and anti-women.

72.     To begin, the leadership at Equinox is almost exclusive dominated by men. Starting with Harvey Spevak, the Executive Chairman and Managing Partner of Equinox, virtually all of the Company's critical executive functions are run by men, including, *inter alia*: (i) President, Scott DeRue; (ii) former President and current Senior Advisor, Scott Rosen; (iii) Co-President and Chief Design Officer, Jeff Weinhaus; (iv) Executive Vice President of Operations and Member Experience, Gianfranco Pozzolini; (v) Executive Vice President and Chief People Officer, David Ard; (vi) Executive Vice President and Chief Marketing Officer,

Peter Giorgi; (vii) Executive Vice President and Chief Technology Officer, Eswar Veluri; (viii) Executive Vice President and Chief Financial Officer, David Phillips; and (ix) Senior Vice President of Revenue, Defendant Gary Browne.

73.     With the exception of the Company's Chief Legal Officer, Yen Chu, every Executive Vice President and President at Equinox is a man.

74.     This fact provides context for the sexually harassing environment in which Ms. Piccolo was forced to work.

75.     It is also in contrast to the Company's disingenuous assertions that more than half of its employees are women.  While that may be true at junior levels, it is clearly not true at the leadership level.

76.     From the very start of her employment, Ms. Piccolo was subjected to a barrage of sexual harassment that continued until her unlawful termination.  Early in her career at Equinox, Ms. Piccolo was sexually harassed by her hiring manager, Phil Ledesma, who on multiple occasions attempted to "make out" with Ms. Piccolo after coercing her into taking car rides with him.

77.     Likewise, Mark Wood, then a Regional Vice President of Operations at the Company, repeatedly asked out Ms. Piccolo and attempted to kiss her.  He also subjected her to unwanted touching and, on numerous occasions, showed up at her home unsolicited in the hopes that she would relent and have sex with him (she did not).

78.     The misogynistic culture at Equinox was so prevalent that as the years went on, even men junior to Ms. Piccolo were free to sexually harass her with impunity.  Various Managers and Regional Sales Directors, including, *inter alia*: (i) Nick Aliferis, Vice President

for the Northeast Region; (ii) John Greco, Regional Sales Director for the Wallstreet area; (iii)

Scott Placona, Regional Director; and (iv) Brian DeCato, Regional Director.

79.     Yet another Regional Sales Manager – Jed Prisby– also egregiously sexually

harassed Ms. Piccolo.  Mr. Prisby would regularly tell Ms. Piccolo that he wanted to "fuck" her

and sent her numerous "dick pics" over the years.  In addition, Mr. Prisby would take every

opportunity to rub up against Ms. Piccolo in a sexual manner when the two were at Equinox

events.

80.     Mr. Prisby's egregious sexual harassment of Ms. Piccolo included the following

text messages:

> Then come over, let's fuck like crazy which we never have but always wanted to, and chips fall where they fall...

> That's where I'm at.

>                                 . . . .

> Slide your pussy on top of my face. Along time coming. Taste you. Please you

> I'll stop if you don't wabt that.

> You're crazy

81.     To be clear, at no time did Ms. Piccolo want to "fuck," or otherwise have a

romantic relationship with Mr. Prisby.

82.     Upon information and belief, Mr. Prisby was terminated on December 13, 2021,

after it was discovered that he was sleeping with one of his direct reports. [7]  Unfortunately, this

---

[7]     By the time of his termination, Mr. Prisby had been promoted to Senior Director of Club
Operations.

termination is a classic "too little too late" situation, as Mr. Prisby had previously been the subject of a sexual harassment complaint that the Company essentially ignored – and after which he continued to sexually harass Ms. Piccolo.

83.     The conduct of the aforementioned individuals is unfortunate and unlawful, but not surprising given the conduct of the Company's senior leadership.

84.     To be certain, Ms. Piccolo was regularly sexually harassed by members of the Company's executive team, including, *inter alia*, Mr. Pozzolini and Mr. Browne, who engaged in the following conduct:

- Staring at Ms. Piccolo's breasts and repeatedly stating that they were distracted because Ms. Piccolo's "boobs are so big."

- Repeatedly asking whether Ms. Piccolo had ever engaged in a "threesome" and, if so, with whom.

- Constantly asking Ms. Piccolo with whom she was sleeping.

- Routinely asking Ms. Piccolo the number of men with whom she had sex.

- Regularly commenting on their perceived notion that Ms. Piccolo's ex-husband had a lot of money, and therefore, that the Company should not have to pay her.

- Asking Ms. Piccolo to try on lingerie in their presence.

- Diminishing Ms. Piccolo's business acumen and telling her that she should focus on closing out sales with male clients because she should be able to do so based on her sexuality alone.

85.     Mr. Browne also referred to Ms. Piccolo as his "work wife" and routinely commented on what Ms. Piccolo was wearing, which he did not do to the men with whom he worked.

86.     To be clear, this sexually harassing conduct was not sporadic, but rather was part and parcel of Ms. Piccolo's daily work environment.

87.     Barry Holmes, Mr. Browne's predecessor as Senior Vice President of Sales, also engaged in sexually inappropriate workplace behavior, including, *inter alia*, pressuring Ms. Piccolo to join him at a strip club (Ms. Piccolo left shortly after they arrived).  He also slept with his own assistant and other subordinates and persistently asked Ms. Piccolo to disclose the number of men with whom she had sex.  He also constantly and inappropriately commented on the tightness, length and necklines of Ms. Piccolo's clothes.

88.     In addition to the foregoing, the full scope of Ms. Piccolo's accomplishments were not recognized while similarly situated but less deserving men were given credit for her work.  Mr. Browne, in particular, routinely belittled and chastised Ms. Piccolo in front of her subordinates.

89.     The irony of this was not lost on Ms. Piccolo, who was falsely accused of being "mean" and "too aggressive" – misogynistic pejoratives that would never have been used to describe a male colleague.

90.     Ms. Piccolo was also left in the dark with respect to important decisions including, for example, the decision to promote Scott Freimauer to the position of Senior Director, Global Corporate Sales, in June 2021.  Notwithstanding the fact that Ms. Piccolo would be reporting to Mr. Freimauer – a discriminatory layering, as he replaced Ms. Piccolo's female colleague, Eilis Fyda – she was not even told in advance that he would be coming in to head the Corporate Sales Division.

91.     Finally, Ms. Piccolo's gender has become an increasing problem for Equinox as she has grown older.  Equinox has a fixation on youth and youthful appearance among its public-facing employees, and Ms. Piccolo's termination is consistent with the Company's pattern and practice of promoting older employees less frequently, and terminating them more often, than

their younger counterparts.  This pattern is embodied in Mr. Browne's hiring practices, as he has sought over the years to hire primarily young women into his organization.  As these younger employees joined Equinox, Ms. Piccolo was pushed out of various decision-making roles and peer-to-peer weekly meetings.  At the time Ms. Piccolo's role was purportedly eliminated, Mr. Browne had just hired four younger account executives and was looking to hire several more.  It was also apparent that if Mr. Browne valued Ms. Piccolo at all, he did so for her looks, as he would treat her even more poorly when she experienced weight gain and would comment about how Ms. Piccolo did not work out in order to embarrass her.

### III.    MS. PICCOLO IS SUBJECTED TO DISCRIMINATION BASED ON HER STATUS AS A CAREGIVER TO HER TWO CHILDREN

92.    Mr. Browne also habitually and emphatically expressed deep contempt for Ms. Piccolo's role as a single mother to her two young children.

93.    This came to a head at the end of 2020 and early 2021, when Mr. Browne denied Ms. Piccolo's reasonable requests to work from home part time to care for her children and address their needs.

94.    For example, Mr. Browne repeatedly communicated that Ms. Piccolo was not allowed to request scheduling or remote work accommodations when schools were physically closed due to the pandemic and childcare options were non-existent.

95.    Mr. Browne even attempted to discipline Ms. Piccolo for purportedly failing to appear "in person" at clubs despite the fact that there was no legitimate reason for her to be physically present in clubs as often as Mr. Browne demanded, and it had never been a requirement for Ms. Piccolo to have an inflexible, in-person schedule.

96.    In fact, she did not even have a desk or office at the Company's offices at Hudson Yards due to the nature of her role.  Indeed, the crux of her role was to work with third-party businesses.  It was a sales job, not an office job.

97.    Moreover, notwithstanding her need to care for her children, Ms. Piccolo performed excellently throughout the pandemic.

98.    During 2020, she effectively led the entire Corporate Sales department on a salary reduced by 25% and largely without the support of her team, the majority of whom had been furloughed.

99.    Nevertheless, Mr. Browne singled out Ms. Piccolo (among those who were not furloughed) and further cut her compensation down to 50% of its original amount without legitimate basis.[8]

100.    When Ms. Piccolo protested that she had children to care for, Mr. Browne revealed his discriminatory animus: "Don't you ever bring your children into this. I don't ever want to hear about your children."

101.    As a result of Mr. Browne's refusal to appropriately accommodate Ms. Piccolo's childcare needs – even after she raised the issue with Human Resources – both she and her daughters suffered significant emotional distress and associated harms.  Ms. Piccolo reported these matters to Mr. Freimauer, and still no remedial action was taken.

---

[8]    Ms. Piccolo's compensation had previously been reduced to 75% of its pre-pandemic amount as part of the Company's cost saving measures when Equinox's clubs were closed during the early days of the pandemic.  Mr. Browne decided, however, that Ms. Piccolo alone should suffer an additional 25% reduction so that she was only making half of what she made before the pandemic.

## IV.    MANY OTHER WOMEN HAVE BEEN SUBJECTED TO AND/OR OBSERVED MISOGYNY AT EQUINOX

102.    Ms. Piccolo is hardly the only victim of the Company's institutional animus

towards equality for women and, in particular, mothers.  By way of example only:

- On January 1, 2020, Alison Sadel (former Equinox National Account Executive) and Megan DiDomenico (former Equinox Senior Regional Sales Manager) filed suit against the Company alleging pay, gender, pregnancy and familial status (caregiver) discrimination.  Among other allegations, Ms. Sadel alleged that Messrs. Browne and Greco repeatedly stated, "What is it with all the account executives getting pregnant," implying that it was a problem for the Company and that pregnant women could not perform their duties.

- Relatedly, on November 16, 2021, Ms. Piccolo received a text message from a man who is the former Director of Leadership at Equinox.  In the text message, he revealed that he had a meeting scheduled with the Company's outside attorneys in connection with the lawsuit brought by Ms. Sadel and Ms. DiDomenico.  He wrote, "lol I dunno why they want me!! I don't lie!" – an obvious acknowledgment that Ms. Sadel's and Ms. DiDomenico's legal claims are meritorious.

- The former Head of Equinox's spa business, Nicole Vitale, alleged in a federal lawsuit that "she heard sales teams routinely went to strip clubs and charged the costs to Equinox, that Equinox's chairman once asked a manager to collect the phone numbers of certain attractive females [and] that an employee was once given a birthday cake in the shape of a female buttocks."[9]

- A female Equinox Corporate Sales Manager suffered a discriminatory failure to promote and was constructively discharged as a result of the harassment she endured at the hands of Mr. Browne.  As a result of the Equinox-induced trauma suffered by this manager, she was out of work for almost two years.

- An older female Account Executive in the Washington, D.C. area, was constructively discharged after Mr. Browne's conduct caused her to become physically ill and develop detrimental health conditions.

---

[9]    Ms. Vitale's claims were dismissed in part on the basis that she was not personally subjected to these activities, a legal deficiency that does not present in Ms. Piccolo's case.

- A lesbian mother of two from Equinox's Northeast Region, who was one of the Company's highest performing Account Executives, was also discriminatorily denied a promotion and constructively discharged.

- Among the very few women who have been promoted within Mr. Browne's organizational structure is the former Regional Sales Director for the Northeast Region. She was discriminatorily demoted after only two years, despite consistently positive performance and without any prior warnings or write-ups.

- Similarly, in 2021 Equinox brought in a female consultant who was ostensibly hired to advocate for women and gender equality in the workplace. She was promptly terminated after she observed a "bro-culture" at Equinox.

- Even when women have served as the Company's purported CEO, Mr. Spevak has retained control over virtually all significant aspects of the management of Equinox.

103. Suffice it to say, Equinox is a very bad environment for women.

## V.   MS. PICCOLO IS DISCRIMINATORILY AND RETALIATORILY TERMINATED

104. There can be no legitimate question that Ms. Piccolo's performance remained outstanding throughout 2021.

105. To this point, in the Spring of 2021, Mr. Rosen went out of his way to tell Ms. Piccolo that she would "retire" at Equinox. Meanwhile, up until the date of her termination, Mr. Freimauer repeatedly praised Ms. Piccolo both verbally and in writing, including, *inter alia*, text messages in which he wrote: (i) "I'm so proud of you!!! Wow"; (ii) "You deserve this bonus so badly"; (iii) "I couldn't be prouder of you over the last 3 days"; (iv) "I'm so proud of your calls today"; (v) "You are beyond a winner!"; (vi) "Nothing to worry about. You need to trust me"; (vii) "Very much team Piccolo"; (viii) "Never never never . . . You aren't going anywhere!!!!"; and (ix) "You did a fantastic job!".

106.    Despite these recent accolades, on November 9, 2021, Ms. Piccolo was summarily terminated under the pretextual guise of a position elimination.  In reality, Ms. Piccolo's termination was the result of her gender, age and childcare responsibilities, as well as concerns she raised about Equinox's relationship with Gympass.

107.    For context, Gympass is a third-party company that sells tiered membership plans which give members access to a variety of gyms, studios, fitness classes and well-being applications.

108.    At its core, Gympass is a competitor of Equinox, as it provides its members access to thousands of non-Equinox options for physical fitness and wellness.  Moreover, Gympass competes with Equinox for corporate clients that subsidize their employees' memberships to physical fitness and wellness providers.

109.    Nevertheless, in 2021, reeling from the financial impact of the pandemic, Equinox—through Mr. Browne—developed a relationship with Gympass pursuant to which Gympass (for an upfront payment) would be permitted to add Equinox as an option to its members in certain areas.

110.    As a result of this disastrous decision, various important corporate clients, including, *inter alia*, Bank of America, Bank of New York and UBS, ceased working directly with Equinox and began working through Gympass.

111.    Other companies were also naturally more likely to work through Gympass given that Equinox was now offered as an option to Gympass members.  Moreover, ordinary non-corporate consumers could begin accessing Equinox through Gympass, rather than directly.

112.    The Gympass relationship presented a whole host of long-term problems that were apparently ignored by Equinox leadership in the hope of a short-term revenue boost.

- First, in areas where Equinox is offered as an option for Gympass members, Equinox reports each new Gympass member as a "member" of Equinox. However, the Gympass members are not Equinox "members" in any real sense of the term. For starters, the vast majority of Gympass members never even use Equinox. This is a real problem because Equinox is heavily dependent on usage to generate revenue beyond annual membership fees through the sale of branded products, additional classes, personal training, etc. Thus, while Equinox has seen a substantial boost in "members," there is no corresponding boost in usage-related revenue.

- Second, permitting members to enroll through Gympass creates an extremely tenuous membership base, even for those who use Equinox. To the extent that the Equinox/Gympass relationship comes to an end, Equinox will automatically lose a substantial percentage of its "membership," all of whom will remain members of Gympass – an Equinox competitor.

- Third, as a result of the Gympass relationship, Equinox has lost, and stands to lose even more, substantial direct revenue from corporate clients who are now reimbursing employees for Gympass memberships rather than Equinox memberships. The shifting of this revenue is a significant problem, even if Gympass pays some amount to Equinox for the right to offer its gyms, because, as described above, a substantial percentage of the membership is now built on a house of cards.

- Fourth, in many instances Equinox has lost the ability to control the branding of wellness events that it organizes for corporate clients, who now want to work with Gympass in addition to (or instead of) Equinox in connection with such events.

113.    Beginning in January 2021, Ms. Piccolo began repeatedly questioning the Gympass relationship. She could not get any straight answers, aside from being told, in sum and substance, "not to stir the pot" because "Gympass has so much cash they could help bring us public."

114.    To make matters worse, she was directed to lie to prospective clients. By way of example, when Morgan Stanley made a Request for Proposal ("RFP"), both Equinox and Gympass were on the short list for the business.

115.    Ms. Piccolo was directed by Mr. Browne (in the presence of Mr. Giorgi and Mr. Freimauer) to lie to Morgan Stanley during Equinox's presentation and state that Equinox did not have a relationship with Gympass, but, rather, that Equinox had only agreed to set up a pilot with Gympass and that the Company had no plans to expand it.

116.    Also prior to the RFP, Mr. Rosen told Ms. Piccolo that Equinox was not renewing the Gympass relationship.  Whether he knew it or not, this turned out to be false, as the relationship with Gympass continued to grow.

117.    To that end, on Friday, November 5, 2021, Ms. Piccolo received a report that indicated a tremendous volume of new "members" through Gympass.  However, it was apparent from the report that the overwhelming majority of these "members" had never stepped foot in an Equinox.

118.    Ms. Piccolo again raised her concerns about the Gympass relationship, as well as this report, to Mr. Freimauer.

119.    In response, Mr. Freimauer told Ms. Piccolo not to say anything because the program would help the Company go public.  In other words, the misleading "membership" numbers and short-term influx of cash from Gympass would make Equinox's fundamentals and financials look far better than they were.

120.    The aforementioned Morgan Stanley presentation occurred on November 8, 2021. Ms. Piccolo was terminated the very next day.

**<u>FIRST CAUSE OF ACTION</u>**
**(Discrimination in Violation of Title VII)**
***Against Defendant Equinox***

121.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

122.     By the actions described above, among others, Equinox discriminated against Plaintiff on the basis of her sex in violation of Title VII by, *inter alia*, by denying her the same benefits, terms and conditions of employment as those which are provided to men.

123.     Equinox's conduct has created, condoned, ratified and acquiesced to a hostile work environment on account of Plaintiff's sex.

124.     As a direct and proximate result of Equinox's unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of damages to the greatest extent permitted by law, including, but not limited to, monetary and/or economic harm, for which she is entitled to an award of money damages, in addition to reasonable attorneys' fees and costs.

125.     As a direct and proximate result of Equinox's unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

126.     Equinox's unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Age Discrimination in Violation of the ADEA)
### *Against Defendant Equinox*

127.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

128.     By the actions described above, among others, Equinox discriminated against Plaintiff on the basis of her age in violation of the ADEA by denying her the same benefits,

terms and conditions of employment as those which are provided to employees under the age of 40.

129.     Equinox's conduct has created, condoned, ratified and acquiesced to a hostile work environment on account of Plaintiff's age.

130.     As a direct and proximate result of Equinox's unlawful and discriminatory conduct in violation of the ADEA, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief.

131.     The conduct described herein constitutes a willful violation of the ADEA for which Plaintiff is entitled to an award of liquidated damages.

### THIRD CAUSE OF ACTION
**(Discrimination in Violation of the NYSHRL)**
***Against All Defendants***

132.     Plaintiff repeats, reiterates and re-alleges each and every allegation in the each of the preceding paragraphs as if fully set forth herein.

133.     By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her sex, age, and/or familial status in violation of the NYSHRL by denying her the same benefits, terms and conditions of employment as those which are provided to men, to younger women and/or those without children under 18 years old.

134.     Defendants' conduct has created, condoned, ratified and acquiesced to a hostile work environment on account of Plaintiff's sex, age and/or familial status.

135.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary

and/or economic harm for which she is entitled to an award of monetary damages and other relief to the greatest extent permitted by law, in addition to reasonable attorney's fees and expenses.

136.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

137.    Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
### *Against All Defendants*

138.    Plaintiff repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

139.    By the actions described above, among others, Defendants retaliated against Plaintiff based on her protected activities in violation of the NYSHRL by engaging in conduct reasonably likely to dissuade and/or deter Plaintiff and others from engaging in protected acts.

140.    Equinox's conduct has created, condoned, ratified and acquiesced to a hostile work environment on account of Plaintiff's engagement in protected activities.

141.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages and other relief to the greatest extent permitted by law, in addition to reasonable attorneys' fees and expenses.

142.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

143.     Defendants' unlawful and retaliatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**(Aiding and Abetting Unlawful Discrimination and Retaliation in Violation of the NYSHRL)**
***Against Defendant Browne***

144.     Plaintiff repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

145.     By the actions described above, among others, Defendant Browne knowingly or recklessly aided and abetted and directly participated in the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYSHRL.

146.     As a direct and proximate result of Defendant Browne unlawful aiding and abetting in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic damages, mental anguish and emotional distress for which she is entitled to an award of damages and other relief to the greatest extent permitted by law, in addition to reasonable attorneys' fees and expenses.

147.     Defendant Browne's unlawful actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (Discrimination in Violation of the NYCHRL)
### *Against All Defendants*

148.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

149.    By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of her sex, age and/or caregiver status in violation of the NYCHRL by denying her the same benefits, terms and conditions of employment as those which are provided to men, younger people and/or those who do not provide direct and ongoing care for minor children.

150.    Defendants' conduct has created, condoned, ratified and acquiesced to a hostile work environment on account of Plaintiff's sex, age and/or caregiver status.

151.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief to the greatest extent permitted by law, in addition to reasonable attorneys' fees and expenses.

152.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

153.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**SEVENTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYCHRL)**
*Against All Defendants*

154.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

155.    By the actions described above, among others, Defendants have retaliated against Plaintiff by engaging in conduct reasonably likely to dissuade and/or deter Plaintiff and others from engaging in protected acts.

156.    Equinox's conduct has created, condoned, ratified and acquiesced to a hostile work environment on account of Plaintiff's engagement in protected activities.

157.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages and other relief to the greatest extent permitted by law, in addition to reasonable attorneys' fees and expenses.

158.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

159.    Defendants' unlawful and retaliatory actions constitute malicious, willful, wanton and/or reckless violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

**EIGHTH CAUSE OF ACTION**
**(Aiding and Abetting Unlawful Discrimination and Retaliation in Violation of the NYCHRL)**
*Against Defendant Browne*

160.    Plaintiff repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

34

161.    By the actions described above, among others, Defendant Browne knowingly or recklessly aided and abetted and directly participated in the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYCHRL.

162.    As a direct and proximate result of Defendant Browne unlawful aiding and abetting in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, economic damages, mental anguish and emotional distress for which she is entitled to an award of damages and other relief to the greatest extent permitted by law, in addition to reasonable attorneys' fees and expenses.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.    An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.    An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment;

D.      An award of damages against Defendant, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

E.      An award of punitive damages, in an amount to be determined at trial;

F.      An award of liquidated damages, in an amount to be determined at trial;

G.      Prejudgment interest on all amounts due;

H.      An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

I.      Such other and further relief as the Court may deem just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  October 24, 2022
        New York, New York

**WIGDOR LLP**

By: _____
        Michael J. Willemin
        Laura E. Edidin

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
mwillemin@wigdorlaw.com
ledidin@wigdorlaw.com

*Attorney for Plaintiff*